879 F.2d 1073
 29 ERC 1839, 19 Envtl. L. Rep. 21,091
 SOLAR TURBINES INCORPORATED, Petitioner,
v.
James M. SEIF, Regional Administrator, Region III, United
States Environmental Protection Agency, and United
States Environmental Protection Agency,
Respondents.
SOLAR TURBINES INCORPORATED, Appellant in No. 88-5623
v.
James M. SEIF, Regional Administrator, Region III, United
States Environmental Protection Agency, and United
States Environmental Protection Agency,
Appellant in No. 88-5591.
 Nos. 88-3178, 88-5591 and 88-5623.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 6, 1988.
Decided June 27, 1989.
 
 Scott M. Turner (argued) (Harold A. Kurland, Ronald G. Hull, of counsel), Nixon, Hargrave, Devans & Doyle, Rochester, N.Y. (Terry R. Bossert, of counsel), McNees, Wallace & Nurick, Harrisburg, Pa., for petitioner in No. 88-3178 and appellant in No. 88-5623.
 Roger J. Marzulla, Asst. Atty. Gen., John Stahr, Jean Anne Kingrey (argued), Sp. Litigation Counsel, Dept. of Justice, Washington, D.C. (Leslie Guinan, of counsel), E.P.A., Region III, Philadelphia, Pa., for respondents in No. 88-3178 and appellant in No. 88-5591.
 Before SLOVITER and BECKER, Circuit Judges, and BARRY, District Judge.*
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 The consolidated appeals and the petition for review in this case are from the preliminary skirmishes in the Environmental Protection Agency's (EPA's) attempt to prevent Solar Turbines Inc., a subsidiary of Caterpillar, Inc., from constructing and operating a cogeneration facility at a Caterpillar, Inc. manufacturing plant in York County, Pennsylvania. We conclude that we cannot reach the merits of the dispute at this juncture.
 
 I. BACKGROUND
 A. The Statute
 
 2
 The procedural posture in which this case reaches us can best be understood after a brief review of the statutory scheme. The Clean Air Act, 42 U.S.C. Sec. 7401 et seq. (1982) (the Act), creates, inter alia, a framework for improving air quality in regions which do not meet national primary and secondary ambient air quality standards, see, e.g., 42 U.S.C. Secs. 7407-10, and for maintaining air quality in those regions which are in compliance with the national standards, see 42 U.S.C. Secs. 7470-79. This national framework relies on the cooperation of the states in administering and enforcing the law and monitoring compliance. Each state has the responsibility of promulgating a State Implementation Plan (SIP) which outlines the means it will adopt to guarantee compliance with the Act. 42 U.S.C. Secs. 7410, 7471. SIPs must be submitted to the EPA for approval. Id. at Sec. 7410.
 
 
 3
 Each SIP must contain a permit program to regulate the "modification, construction, and operation of any stationary source." 42 U.S.C. Sec. 7410(a)(2)(D). Regions which are in compliance with the national primary and secondary ambient air quality standards are subject to the provisions of the statute governing "Prevention of Significant Deterioration of Air Quality" (PSD), 42 U.S.C. Secs. 7470-79. In such regions, no "major emitting facility" may be constructed without a PSD permit. 42 U.S.C. Sec. 7475(a)(1). A "major emitting facility," which is defined, inter alia, as any stationary source with "the potential to emit two hundred and fifty tons per year or more of any air pollutant," 42 U.S.C. Sec. 7479(1), must incorporate the "best available control technology" (BACT) for each regulated pollutant. 42 U.S.C. Sec. 7475(a)(4). "Best available control technology" is defined as that emission limitation which the permitting authority determines is the maximum achievable, taking into account energy, environmental and economic considerations. 42 U.S.C. Sec. 7479(3). Because York County, Pennsylvania, has met the baseline air quality standards for all pollutants except ozone, facilities located there are subject to these PSD provisions.
 
 
 4
 Among the various enforcement mechanisms which the EPA is given by the Act is that contained in section 167 of the Act, 42 U.S.C. Sec. 7477, which states that "[t]he [EPA] shall, and a State may, take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction of a major emitting facility which does not conform to the requirements of this part." The effect of a section 167 order is at the center of this appeal.
 
 B. Procedural History
 
 5
 On September 16, 1986 Solar Turbines filed an application with the Pennsylvania Department of Environmental Resources (PADER) for a PSD permit to construct the gas turbine cogeneration facility in York County. PADER granted the permit on September 9, 1987, thereby authorizing Solar Turbines to construct and begin operating a facility comprising six gas turbines at Caterpillar's York plant. This cogeneration facility is designed to produce electricity and thermal energy simultaneously and to sell the output to Caterpillar for the energy needs of the York plant and excess electricity to the Metropolitan Edison Company, a local utility. PADER issued the permit without requiring any controls for nitrogen oxide (NOx) emissions, notwithstanding the EPA's position communicated to it that, inter alia, the NOx limit contained in the permit did not adequately reflect BACT. EPA informed PADER that for many permits issued for new gas turbines in other states BACT was determined to require water or steam injection to control NOx emissions.
 
 
 6
 On January 25, 1988 the EPA issued an administrative order pursuant to section 167 of the Clean Air Act, 42 U.S.C. Sec. 7477, asserting that the cogeneration facility as approved by PADER would use a process which failed to comply with the requirements of PSD and that Solar Turbines would not incorporate BACT as required by Sec. 165(a)(4), 42 U.S.C. Sec. 7475(a)(4), in its controls restricting emissions of nitrogen oxide. The order "requir[ed] the immediate cessation of construction and/or operation of the gas turbine facility at Caterpillar Tractor." EPA App. at 1.
 
 
 7
 On February 10, 1988 Solar Turbines filed a complaint in the district court for the Middle District of Pennsylvania against the EPA and James M. Seif, the Regional Administrator for the EPA, seeking a declaratory judgment that the administrative order was unlawfully issued and requesting injunctive relief requiring the EPA to withdraw the order. Solar Turbines' principal argument is that because EPA approved Pennsylvania's State Implementation Plan, which incorporates the federal standards for pollution control, see 25 Pa.Code Secs. 127.81--127.83 (1987), the EPA is precluded from challenging construction or operation of a facility after PADER has given its final approval thereto.
 
 
 8
 On February 12, 1988 the district court issued a temporary restraining order and enjoined the EPA from enforcing its administrative order. Solar Turbines, Inc. v. Seif, 678 F.Supp. 93, 98 (M.D.Pa.1988). The court ruled that the issuance of the administrative order was not a final agency action, that it had federal question jurisdiction under 28 U.S.C. Sec. 1331 and jurisdiction under the Clean Air Act, 42 U.S.C. Sec. 7401 et seq., that the dispute was ripe because of the threat of sanctions against Solar Turbines, and that Solar Turbines had made the requisite showing to be entitled to a temporary restraining order.
 
 
 9
 The EPA promptly filed a motion to vacate or dismiss the temporary restraining order. While the motion was pending, Solar Turbines filed a petition for review of the EPA's administrative order with this Court, which is docketed at No. 88-3178.
 
 
 10
 Shortly thereafter, on May 26, 1988, the district court granted the EPA's motion to dismiss and vacate the temporary restraining order, reversing its earlier position and now holding that the administrative order issued by the EPA was a final agency action, which could be reviewed only in the court of appeals. The court dismissed Solar Turbines' action for lack of jurisdiction. Solar Turbines, Inc. v. Seif, 688 F.Supp. 1012 (M.D.Pa.1988).
 
 
 11
 On June 17, 1988 the EPA withdrew its administrative order and filed an action in district court pursuant to section 167 of the Act, 42 U.S.C. Sec. 7477, seeking injunctive relief preventing further construction by Solar Turbines. The district court stayed the enforcement action pending resolution of this appeal.
 
 
 12
 On July 22, 1988 the EPA filed an appeal from the district court's May 26 order dismissing the action. EPA's appeal is docketed at No. 88-5591. Although the EPA agrees with the district court's determination that it had no jurisdiction, its appeal seeks to challenge that court's conclusion that the administrative order constituted a final agency action.
 
 
 13
 On August 1, 1988 Solar Turbines filed a cross-appeal from the district court's May 26 order, claiming that the district court properly had jurisdiction of its challenge to EPA's action on grounds that it was ultra vires. This appeal is docketed at No. 88-5623.
 
 II. Nos. 88-5591, 88-5623
 
 14
 The Cross-Appeals From the District Court's Order
 
 
 15
 The cross-appeals from the district court's order turn on the question of the district court's jurisdiction. EPA argues that the district court had no subject matter jurisdiction over Solar Turbines' action because the Clean Air Act precludes pre-enforcement review of section 167 administrative orders. We look to the Supreme Court's decision in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), for the standard for determining the appropriateness of pre-enforcement review of agency action in general. Under the analysis applied there, we must first inquire whether anything in the statute prohibits pre-enforcement review of the challenged action. Id. at 139-40, 87 S.Ct. at 1510-11.
 
 
 16
 Section 307 of the Clean Air Act, 42 U.S.C. Sec. 7607, expressly sets forth the procedural route and timing for judicial review of EPA actions. Section 307(a) gives the EPA the authority to issue administrative subpoenas and gives the district courts jurisdiction over actions to enforce such subpoenas. Section 307(b)(1) provides for judicial review in the courts of appeals over actions of the EPA in promulgating rules, regulations and standards, and approving State Implementation Plans. Finally, section 307(e) states that "[n]othing in this chapter shall be construed to authorize judicial review of regulations or orders of the [EPA] under this chapter, except as provided in this section." 42 U.S.C. Sec. 7607(e).
 
 
 17
 Because the Act explicitly provides for review of certain actions and explicitly denies review for everything else, we cannot look elsewhere for authority to justify the district court's review. "If Congress specifically designates a forum for judicial review of administrative action, such a forum is exclusive." Getty Oil Co. v. Ruckelshaus, 467 F.2d 349, 356 (3d Cir.1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 356 (1973); see also Cost Control Marketing and Management, Inc. v. Pierce, 848 F.2d 47, 49 (3d Cir.1988) (per curiam); Connors v. Tremont Mining Co., 835 F.2d 1028, 1029-30 (3d Cir.1987); Compensation Dept. of Dist. Five, United Mine Workers of Am. v. Marshall, 667 F.2d 336, 340-44 (3d Cir.1981).
 
 
 18
 Solar Turbines contends that section 307(e) is not applicable in this instance because it is "seeking to enjoin plainly ultra vires EPA action under constitutional, Administrative Procedure Act, and common law principles." While there may be certain extraordinary circumstances in which Congress' creation of an exclusive avenue for judicial review of agency action may be bypassed by an action in the district court, see Leedom v. Kyne, 358 U.S. 184, 190, 79 S.Ct. 180, 184-185, 3 L.Ed.2d 210 (1958) (district court review available if it is the only means to protect a statutory right clearly violated by agency action); Fitzgerald v. Hampton, 467 F.2d 755, 768-69 (D.C.Cir.1972) (procedures employed by agency obviously violated constitutional right); see generally C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure Sec. 3943 at 324-30 (1977 & 1988 Supp.), such circumstances are not present here. Despite Solar Turbines' attempt to characterize its claims otherwise, it is evident that Solar Turbines' district court action in fact seeks to challenge the merits of EPA's position under the Clean Air Act. Whether Solar Turbines is correct in its assertion that the EPA has no statutory authority to contest the PSD permit because the EPA has approved Pennsylvania's implementation plan is an issue fully cognizable in the district court in the enforcement action initiated by the EPA, or pursuant to a petition for review in this court if the EPA takes some "final action" within the meaning of section 307(b) of the Act.
 
 
 19
 The results reached in cases seeking to challenge administrative orders under section 113 of the Clean Air Act, the most closely analogous provision to section 167,[1] are fully in accord with the result we reach today. Both this court in West Penn Power Co. v. Train, 522 F.2d 302 (3d Cir.1975), cert. denied, 426 U.S. 947, 96 S.Ct. 3165, 49 L.Ed.2d 1183 (1976), and the Eighth Circuit in Union Electric Co. v. EPA, 593 F.2d 299 (8th Cir.), cert. denied, 444 U.S. 839, 100 S.Ct. 76, 62 L.Ed.2d 50 (1979), held that a Notice of Violation issued under section 113(a)(1) was not subject to pre-enforcement review because the agency action did not inexorably lead to an enforcement action; it only "trigger[ed] the statutory mechanism for informal accommodation which precedes any formal enforcement measures," West Penn Power, 522 F.2d at 311; see Union Electric Co., 593 F.2d at 304. For the same reasons, in Lloyd A. Fry Roofing Co. v. EPA, 554 F.2d 885, 891 (8th Cir.1977), the court held that a compliance order issued by the EPA pursuant to section 113(a)(1) could not be challenged in the district court until the EPA brought an enforcement action under section 113(b).[2]
 
 
 20
 The basis for these decisions was the statutory framework created by Congress for obtaining compliance with the Clean Air Act which led to the conclusion that pre-enforcement review would interfere with that framework. While these cases were interpreting section 113(a), which unlike section 167 mandates the procedures and timing of agency action to follow issuance of a notice of violation, the reasoning which underlays those cases remains relevant to section 167 as well. A challenge to a section 167 administrative order would intrude on the procedural sequence created by Congress whereby parties receiving notice of noncompliance are first encouraged to resolve their problems with the states and with EPA in an informal, less costly manner. Judicial review becomes appropriate when the EPA, failing efforts at negotiation and compromise, takes steps at enforcement subjecting the facility to consequential penalties.
 
 
 21
 It follows that the district court had no subject matter jurisdiction over Solar Turbines' action, see FCC v. ITT World Communications, Inc., 466 U.S. 463, 468-69, 104 S.Ct. 1936, 1939-40, 80 L.Ed.2d 480 (1984) (district court lacks jurisdiction where claims could be presented via statutorily prescribed petition for review in court of appeals and where district court complaint raises same issues as petition for review), whether or not the administrative order was final. That issue is one for this court. We will therefore affirm the court's dismissal, albeit for reasons different from those relied on by the district court.[3]
 
 III. No. 88-3178
 
 22
 A. The Withdrawal of the Administrative Order
 
 
 23
 We turn therefore to the petition for review to determine if that is an appropriate route for review at this time. We consider first the EPA's argument that the petition for review is moot because EPA has withdrawn the administrative order.
 
 
 24
 The issue of mootness following the withdrawal of agency action is not a new one for this court. In Hooker Chemical Co. v. EPA, 642 F.2d 48 (3d Cir.1981), Hooker Chemical Co. and Tenneco Chemicals, Inc. filed petitions to review EPA orders finding their discharges of vinyl chloride to be in violation of the Clean Air Act and directing them to implement measures to prevent further discharges. The EPA thereafter withdrew its orders, but continued to insist that the dischargers' actions violated the regulations and stated that it would still take appropriate enforcement measures. Id. at 49-50. We refused to hold the dispute moot, noting that "[a]n enforcement proceeding has been instituted against Tenneco as a result of the vinyl chloride discharges, and it is not unreasonable to assume that some, if not all, of the same issues will be contested in that litigation." Id. at 52.
 
 
 25
 In Dow Chemical Co. v. EPA, 605 F.2d 673 (3d Cir.1979), Dow filed a petition to review a rule promulgated by the EPA pursuant to the Toxic Substances Control Act which would have forced companies to release to the EPA certain information concerning research they had conducted. Dow challenged the rule on the grounds that it was inconsistent with the statute and also that its promulgation failed to conform with the notice and comment procedures required by the Administrative Procedure Act. In response, the EPA withdrew the rule, but continued to assert its authority to issue the rule and in fact renewed its rulemaking procedures in order to repromulgate the rule.
 
 
 26
 This court held that the controversy was not mooted by virtue of the EPA's withdrawal of its rule. The EPA's action was not an indication of any reluctance or hesitation regarding the agency's position that the statute permitted such a rule. In fact, by initiating the process to repromulgate the rule, the EPA demonstrated its steadfast commitment to requiring the release of the desired information. With such a posture, the controversy could not be considered moot.
 
 
 27
 In Dow, we also considered whether, even if the legal prerequisites for Article III jurisdiction were satisfied, there were policy considerations that would warrant application of the mootness doctrine. We noted first that it was the EPA who was urging that the dispute was mooted by its withdrawal of the rule, and we stated that "[c]ourts are understandably reluctant to permit agencies to avoid judicial review, whenever they choose, simply by withdrawing the challenged rule." Id. at 678. In the absence of an agency's change of heart or desire to reconsider its position, we could not permit the mere withdrawal of the rule to effectuate avoidance of review; otherwise, "the timing and venue of judicial review could be effectively controlled by the agency." Id. at 679.
 
 
 28
 Informed by our precedent, we hold that here also the EPA's withdrawal of the administrative order did not render the petition for review moot. EPA has not altered its position on the merits, and indeed has instituted an action in the district court seeking injunctive relief to prevent further violation of the Clean Air Act on the same grounds as contained in the administrative order. Here, as in Hooker, we cannot allow the agency to control the timing and venue of judicial review by its own procedural maneuvers.
 
 B. Review of the Administrative Order
 
 29
 Of course, even if the petition for review is not moot, we must still decide if the petition is properly before us at this time. Section 307(b) of the Act provides for direct review in a federal court of appeals of certain enumerated actions not relevant here as well as "any other final action." See 42 U.S.C. Sec. 7607(b)(1) (emphasis added).[4] The Supreme Court has interpreted the phrase "any other final action" to incorporate the finality requirement of the Administrative Procedure Act. See Harrison v. PPG Industr., Inc., 446 U.S. 578, 586, 100 S.Ct. 1889, 1894, 64 L.Ed.2d 525 (1980).
 
 
 30
 The EPA issued the administrative order to Solar Turbines pursuant to section 167 of the Act, 42 U.S.C. Sec. 7477, which requires the EPA to take measures, including issuing an order or seeking injunctive relief, to prevent the construction of a nonconforming major emitting facility.
 
 
 31
 The Administrative Order in this case sets forth what are denominated as "Findings of Fact," "Conclusions of Law," and an "Order." Such characterizations are ordinarily made by an agency or court following a hearing. There was no such hearing or adversarial factfinding process in this case. Thus, notwithstanding the headings, the "Findings of Fact" and "Conclusions of Law" merely state EPA's position and are best analogized to a complaint. They allege the EPA's position with respect to the relevant facts,[5] the crux of the dispute,[6] the procedural sequence, and EPA's legal position.[7]
 
 
 32
 Although the language of the "Order" section "ordered" Solar Turbines to cease construction and operation of the facility immediately, and the cover letter accompanying the administrative order stated that "[f]ailure to comply with this Order could subject your firm to civil and criminal liabilities pursuant to the Clean Air Act," Petitioner's App. at 1, all parties agree that the administrative order is not self-executing. The EPA argues that because violation of the administrative order in itself effects no legal or relevant practical consequences, and such an "Order" requires court action to enforce, it is not "final action" within the meaning of section 307(b).
 
 
 33
 This is apparently the first case to consider the effect of a section 167 administrative order. Counsel for the EPA states that she knows of no other and our independent research has uncovered none. Nonetheless, we are guided by the Court's analysis in Abbott Laboratories v. Gardner, 387 U.S. 136, 148-56, 87 S.Ct. 1507, 1515-1519, 18 L.Ed.2d 681 (1967), which outlined the requirements for ripeness, and FTC v. Standard Oil Co., 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), which incorporated the ripeness standard into the standard for determining whether agency action is final. See Carter/Mondale Presidential Comm., Inc. v. FEC, 711 F.2d 279, 285 (D.C.Cir.1983); see also C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure Sec. 3942 at 314-15 and cases cited in n. 6 (1977 & 1988 Supp.) (noting substantial overlap, if not interchangeability, of notions of finality and ripeness).
 
 
 34
 In Standard Oil, the Supreme Court ruled that the issuing of a complaint by the Federal Trade Commission to initiate proceedings against Standard Oil under section 5 of the Federal Trade Commission Act lacked finality. On the other hand, in Abbott Laboratories the Court ruled that a suit by drug manufacturers challenging regulations promulgated by the Food and Drug Administration requiring prescription drug manufacturers and retailers to display a drug's generic name every time the brand name is used was ripe for judicial review.
 
 
 35
 We are advised in Abbott Laboratories that finality is to be "interpreted ... in a pragmatic way." 387 U.S. at 149, 87 S.Ct. at 1515. The factors to be considered in assessing finality are: First, does the agency action represent the definitive position of the agency? Second, does the agency pronouncement have the status of law, so that immediate compliance is expected? Third, does the agency action have an immediate impact on the daily operations of the plaintiff? Fourth, is the dispute over a pure question of law, without the need for factual development? Finally, will a pre-enforcement challenge speed enforcement of the relevant act? Standard Oil, 449 U.S. at 239-40, 101 S.Ct. at 493; Abbott Laboratories, 387 U.S. at 149-53, 87 S.Ct. at 1515-1518.
 
 
 36
 It does appear that the EPA has taken a definitive position on the question of Solar Turbines' compliance with the requirements of PSD and, if we resolved the issue of EPA's authority to override PADER's approval of Solar Turbines' emissions controls in EPA's favor, our holding would probably speed enforcement of the Act. On the other hand, it is not clear whether the merits in this case present a pure question of law or require factual development, an issue on which the parties disagree. In any event the determinative factor on finality in this case is that the administrative order has no operative effect on Solar Turbines.
 
 
 37
 Even though the wording of the administrative order is in the imperative and directs immediate compliance with its command to stop construction or operation of the cogeneration facility, and even though the accompanying letter seems to threaten civil and criminal liability upon noncompliance, no civil or criminal liabilities accrue from the violation of the order. The EPA concedes that its only enforcement mechanism with teeth under section 167 is the injunctive relief alternative, which the EPA has finally chosen to pursue in the ongoing action in the district court.
 
 
 38
 The plain language of the statute does not identify any adverse consequences from violating a section 167 administrative order. The EPA has promulgated no regulations to accompany section 167 which impose a sanction for violation of such an order. We have found no legislative history that Congress intended any meaningful consequences from a violation of a section 167 order. The only apparent function of a section 167 order is to serve as a vehicle by which the EPA can notify a party that it believes the requirements of PSD are being violated. Even though section 167 does not contain the statutory provision of a thirty-day period for informal consultation prior to the commencement of enforcement actions which section 113 contains, see 42 U.S.C. Sec. 7413(a)(1); West Penn Power Co. v. Train, 522 F.2d 302, 310-11 (3d Cir.1975), cert. denied, 426 U.S. 947, 96 S.Ct. 3165, 49 L.Ed.2d 1183 (1976), notice provided by a section 167 order can initiate a period of negotiation and hopefully produce a satisfactory resolution, which makes resort to the more time-consuming and cumbersome alternative of an injunctive action unnecessary.
 
 
 39
 A section 167 order is thus unlike those administrative actions which have been held to be final agency action because of their practical consequences. See, e.g., Abbott Laboratories, 387 U.S. at 152-53, 87 S.Ct. at 1517-18 (regulations had "the status of law and violations of them carr[ied] heavy criminal and civil sanctions," and compliance would have required significant expenses in repackaging pharmaceutical products); Frozen Food Express v. United States, 351 U.S. 40, 43-44, 76 S.Ct. 569, 570-71, 100 L.Ed. 910 (1956) (ICC's classification of certain commodities as nonagricultural thereby affecting the rates available to carriers was final agency action because failure to adhere to the classification exposed carriers to civil and criminal liability); Columbia Broadcasting System v. United States, 316 U.S. 407, 418, 62 S.Ct. 1194, 1200, 86 L.Ed. 1563 (1942) (promulgation of FCC regulations precluding approval of licenses for radio stations which had certain types of contracts with broadcasting networks could be challenged because failure to comply subjected a station to revocation of its license, and therefore the regulations "have the force of law before their sanctions are invoked as well as after"); A.O. Smith Corp. v. FTC, 530 F.2d 515, 522-24 (3d Cir.1976) (FTC orders requiring plaintiffs to submit extensive financial information about their businesses pursuant to a federal reporting program were ripe for judicial resolution because plaintiffs risked civil fines for noncompliance and compliance required the commitment of substantial resources, which would have resulted in lost profits).
 
 
 40
 Solar Turbines' situation is more similar to those of parties whose challenges were dismissed because the administrative action lacked finality. See Standard Oil, 449 U.S. at 242, 101 S.Ct. at 494 ("[s]erving only to initiate the proceedings, the issuance of the complaint ... ha[d] no legal force comparable to that of the regulation at issue in Abbott Laboratories, nor any comparable effect upon Socal's daily business"); Wearly v. FTC, 616 F.2d 662, 667-68 (3d Cir.), cert. denied, 449 U.S. 822, 101 S.Ct. 81, 66 L.Ed.2d 25 (1980) (plaintiff cannot challenge FTC's subpoena duces tecum by suit in district court but must await the FTC's enforcement action because, among other reasons, waiting for an enforcement action did not result in civil or criminal penalties); Hooker Chem. Co. v. EPA, 642 F.2d 48, 53 (3d Cir.1981) ("[t]he absence of a requirement to comply with the orders of the EPA at this time ... militates against a finding that [review is appropriate]").
 
 
 41
 Solar Turbines suggests that the administrative order requires it to change its day-to-day conduct but it offers no concrete examples. In fact, at oral argument counsel for Solar Turbines stated that construction of the cogeneration facility was continuing, and affidavits submitted by employees of Solar Turbines indicate that the facility must be nearing completion, if its operation has not commenced already. Thus, even if uncertainty in long-term corporate decisionmaking could possibly be viewed as an adverse consequence of a section 167 order lending legitimacy to the claim of finality, an issue we expressly do not decide, there is no basis on this record to find that Solar Turbines is currently facing a Hobson's choice.[8]
 
 
 42
 In many respects, Solar Turbines' situation is like that of the plaintiff in Wilmac Corp. v. Bowen, 811 F.2d 809 (3d Cir.1987), a nursing facility which hoped to build an addition and gain Medicaid certification of the new beds. Plaintiff challenged amendments by the Pennsylvania Department of Public Welfare to the state's Medicaid reimbursement scheme which eliminated Medicaid reimbursement for capital costs and would have reduced the plaintiff's return on the addition. The plaintiff sought to challenge the amendments in the district court prior to completing the addition to the nursing facility. We ruled that the challenge was not ripe because plaintiff was not threatened with any injury or sanction by completing construction, and no action was compelled. Plaintiff's future economic return was simply placed in some uncertainty, id. at 813, and this uncertainty alone was not enough hardship to warrant review. See also Suburban Trails, Inc. v. New Jersey Transit Corp., 800 F.2d 361, 365-67 (3d Cir.1986) (preliminary state agency action not final or ripe if only adverse effect is "some uncertainty over [plaintiff's] eventual inclusion in the grant program").
 
 
 43
 We thus conclude that because Solar Turbines is not compelled to obey the order at the risk of sanctions and does not face severe hardship as a result of the order, the administrative order issued under section 167 does not constitute final agency action. Therefore, Solar Turbines' petition for review must be dismissed.
 
 IV. CONCLUSION
 
 44
 For the reasons set forth above, we will affirm the district court's dismissal of Solar Turbines' action, and we will dismiss Solar Turbines' petition for review of the EPA's administrative order.
 
 
 45
 BECKER, Circuit Judge, concurring.
 
 
 46
 I join in the court's judgment and in Parts I, II and III-A of its opinion. I do not, however, join in Part III-B. Although I ultimately conclude, as does the majority, that the order in question here is not final and therefore not reviewable in the court of appeals, I believe that the question whether a section 167 cease and desist order is final is far closer than the majority opinion renders it, and I approach the issue quite differently.
 
 
 47
 * Where a statute allows for appellate review of agency action, the Supreme Court has held that such jurisdictional provisions should be construed generously, absent clear and convincing evidence of a contrary congressional intent. See Lindahl v. Office of Personnel Management, 470 U.S. 768, 778, 105 S.Ct. 1620, 1626, 84 L.Ed.2d 674 (1985). The question whether a statute precludes judicial review "is determined 'not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved.' " Id. (citation omitted). Relevant considerations in discerning whether judicial review would likely further the purposes of the statute include the fitness of issues for judicial resolution, the hardship to the parties of deferring judicial review, the extent to which the agency action represents a definitive statement of the agency's position rather than a tentative view, and the extent to which judicial review will disrupt the regulatory process. See generally Abbott Laboratories v. Gardner, 387 U.S. 136, 149-55, 87 S.Ct. 1507, 1515-19, 18 L.Ed.2d 681 (1967).
 
 
 48
 The challenged order in this case required the immediate cessation of construction of Solar's gas turbine facility. It further ordered that Solar certify its compliance with the order within 10 days after its receipt. EPA's cover letter accompanying the order stated that "[f]ailure to comply with this Order could subject your firm to civil and criminal liabilities pursuant to the Clear Air Act, as amended." This language has the clear ring of finality to it. Indeed, the majority concedes that the order reflects EPA's definitive position on the question of Solar Turbine's compliance with the requirements of PSD, thus satisfying one of the Abbott Laboratories criteria.
 
 
 49
 The acknowledged linchpin of the majority opinion lies in its conclusion that the order has no adverse legal consequences on Solar Turbines, Maj. Op. at 1081, and that the sole source of sanction against it is the incipient enforcement action. I am not so sure. Pursuant to 40 C.F.R. Sec. 15.31(a) (1988), Solar Turbines may be placed, prior to resolution of the enforcement action, on the EPA's blacklist, making it ineligible for the award of many federal government contracts. Moreover, section 304, 42 U.S.C. Sec. 7604(a)(1)(B), states that citizens may bring suit against any person who is alleged to be in violation of an order issued by the Administrator; the order would therefore seem to submit Solar Turbines to the possibility of citizen suits, a serious threat to Solar's economic interests. But even assuming that the majority has the better of the argument as to the order's absence of adverse legal consequences, we must confront the fact that the Supreme Court has frequently held agency action to be final and reviewable even though no civil or criminal liabilities accrue from the action.
 
 
 50
 In Harrison v. PPG Industries, Inc., 446 U.S. 578, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980), for example, the Supreme Court confronted the issue whether the EPA's informal adjudication that certain boilers constituted a "new source" under section 111 of the Clean Air Act was a final agency action within the meaning of section 307(b). The Fifth Circuit had held that although the informal proceeding had been completed, the court of appeals did not have jurisdiction to review it because of the practical difficulties of direct appellate review in light of the "skeletal" character of the administrative record. See PPG, 587 F.2d 237, 244 (5th Cir.1979). The Supreme Court reversed, holding that "[s]hort of an enforcement action, EPA has rendered its last word on the matter" and that the adjudication fell within the "any other final action" catchall of section 307(b)(1). See 446 U.S. at 586, 100 S.Ct. at 1894; see also 446 U.S. at 603-04, 100 S.Ct. at 1903-1904 (Stevens, J., dissenting) (agreeing with majority that agency action was final). This same reasoning applies in the instant case. As far as I can tell, the EPA's informal adjudication in PPG had no more legal effect than does the administrative order in this case.
 
 
 51
 In Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956), the Supreme Court held that an order by the Interstate Commerce Commission was subject to judicial review. Justice Harlan argued in dissent that "no administrative or criminal proceeding can be brought for violation of the order itself"; the "order" was simply an announcement that the Commission "interpret[ed] the [Interstate Commerce] Act in a particular way." 351 U.S. at 45, 47, 76 S.Ct. at 572, 573. The other eight justices did not respond to the no-legal-effect premise of Justice Harlan's dissent, but nevertheless held that the "order" was reviewable:
 
 
 52
 The determination by the Commission ... has an immediate and practical impact on carriers.... The "order" of the Commission warns every carrier, who does not have authority from the Commission to transport [certain] commodities, that it does so at the risk of incurring criminal penalties.
 
 
 53
 351 U.S. at 43-44, 76 S.Ct. at 570-71. Solar Turbines was similarly warned in the section 167 order that it could face civil and criminal penalties if it continued its present course of action. To be sure, the agency action in Frozen Food Express affected more businesses than did the section 167 order in the instant case, but that other businesses were not immediately affected in this case does not lessen the hardship to Solar Turbines in deferring judicial review.[1]
 
 
 54
 I understand the majority as distinguishing such cases on the ground that "there is no basis on this record to find that Solar Turbines is currently facing a Hobson's choice." Maj. Op. at 1082. This conclusion is apparently based on counsel's representations at oral argument that "construction of the cogeneration facility was continuing ... if its operation has not commenced already." Id. at 1082. I will not engage the majority as to the precise meaning of a "Hobson's choice"[2] or its legal significance as a measure of administrative finality. I do note, however, that to the extent that construction of the facility has been completed, Solar Turbines must choose between not operating the completed plant (an extremely costly option) and operating the plant despite the attendant risk of enormous penalties.[3] To the extent that construction of the facility is not yet complete, Solar Turbines must choose among installing the technology that the EPA asserts is required, continuing to install the technology approved by PADER with the attendant risk that the facility will later have to be retrofitted at enormous expense, and halting construction until the dispute has been adjudicated. Hence, in the absence of a declaratory judgment as to whether its technology meets the BACT standard, I believe that Solar Turbines is faced with a problem as serious as that faced by PPG or Frozen Food Express regardless of whether it has completed the construction of its facility. This dilemma suggests compliance with another of the Abbott Laboratories criteria. Moreover, we have been cited to no indicia of congressional intent to deny review of a section 167 order.
 
 II
 
 55
 Where deferring judicial review of informal agency adjudication creates hardship to a party subject to the adjudication, the agency action has frequently been held to be reviewable. This is not to say, however, that such adjudications are always reviewable. In West Penn Power Co. v. Train, 522 F.2d 302 (3d Cir.1975), cert. denied, 426 U.S. 947, 96 S.Ct. 3165, 49 L.Ed.2d 1183 (1976), we held that a section 113 notice of violation was not final agency action and hence not reviewable.[4] Judge Adams wrote a forceful dissenting opinion relying principally on the acute hardship caused by holding EPA adjudication unreviewable in this context. The majority, however, rejected these arguments, stating that a notice of violation merely "trigger[ed] the statutory mechanism for informal accommodation which precedes any formal enforcement measures." 522 F.2d at 311. Since the majority rejected the arguments for reviewability in West Penn in a context not wholly dissimilar to a section 167 order, West Penn may be the best case supporting EPA's non-finality position. Indeed, a section 113 notice of violation arguably has greater legal effect than a section 167 order because the section 113 notice is a necessary precondition for the assessment of penalties of $25,000 per day of violation. See 42 U.S.C. Sec. 7413(c)(1)(A)(ii); United States v. Louisiana-Pacific Corp., 682 F.Supp. 1141, 1163 (D.Colo.1988); United States v. SCM Corp., 667 F.Supp. 1110, 1122-23 (D.Md.1987).
 
 
 56
 One could argue that a section 113 notice of violation seems more like the FTC complaint held non-final in FTC v. Standard Oil Co., 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), than a section 167 order: like the FTC complaint, a notice of violation could be said to involve not a final determination of the agency's position on a matter but merely an agency decision that it may be necessary to bring an enforcement suit. As the majority notes, the statute envisions that section 113 notices are to be followed by informal consultation between the EPA and the polluter, so that the polluter has an opportunity to dissuade the EPA from its position. Although both a section 167 order and a section 113 notice are pre-enforcement agency actions, a section 167 order does seem to have a greater ring of finality to it; there can be no doubt from the language of the section 167 order in this suit that it represents the EPA's final position as to whether Solar Turbines has complied with its BACT obligations.
 
 
 57
 Although these arguments have considerable force, they are somewhat awkward as applied to the instant case. Since the section 167 order in this case preceded the section 113 notice, it would indeed seem untoward to hold that the section 167 order represented final agency action while a section 113 notice is analogous to a mere decision to sue held non-final in Standard Oil. In addition, although it is disturbing to establish a judicial review regime that denies declaratory relief to those in Solar Turbine's position, it is also awkward for a court of appeals to conduct judicial review of the type of informal adjudication rendered in this case, for there is no record here to speak of. The lack of a record in a case which might require one is, in my view, a powerful factor inveighing against a finding of finality. See Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. at 1515.
 
 
 58
 Although the question here is extremely close and the applicable law quite muddy, I am inclined to think that we should follow West Penn and hold the section 167 order in this case to be non-final. A holding that the order is non-final has the advantage of permitting development of a record in an orderly way and is also consonant with our decision in West Penn.
 
 
 59
 It is true that the Supreme Court in PPG held that an EPA informal adjudication that certain boilers constituted a section 111 "new source" was final agency action within the meaning of section 307(b); the Court rejected the argument that the courts of appeals are ill-suited to the task of review of such action by noting that in a case in which the administrative record is inadequate "an appellate court may always remand a case to the agency for further consideration." 446 U.S. at 594, 100 S.Ct. at 1898. PPG is (at least somewhat) unlike the instant case, however, in that were we to exercise appellate review in this case and vacate the section 167 order for want of an adequate record, it would lead to nothing but confusion. Vacating the order on this ground would not render to Solar Turbines the declaratory judgment that it seeks. Moreover, if we did hold that the section 167 order were final and hence subject to review, section 307(b)(2), on its face, would preclude Solar Turbines from challenging the substance of the section 167 order in the EPA's enforcement action. See PPG, 446 U.S. at 592 n. 9, 100 S.Ct. at 1897 n. 9 (Under Sec. 307(b)(2) any agency action that was reviewable in the courts of appeals cannot be challenged in an enforcement proceeding, whether or not review was actually sought.). Hence the EPA enforcement proceeding would presumably be placed in limbo while the EPA conducted an administrative proceeding to create a record fit for review in this court. In PPG, the EPA had not brought an enforcement proceeding subsequent to its informal adjudication.
 
 
 60
 The Supreme Court has held that a "relevant consideration[ ] in determining finality [is] whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication." Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970). Similarly, Judge Leventhal writing for the D.C. Circuit has stated that "[t]he ultimate question is whether the problems generated by pre-enforcement review are of such a nature that, taken together, they outweigh the hardship and interest of plaintiff's members and establish that judicial review of [an agency's] interpretative ruling should be deferred." National Automatic Laundry & Cleaning Council v. Shultz, 443 F.2d 689, 702 (D.C.Cir.1971). In light of the potential that a holding of finality would disrupt the regulatory process in this case, these practical perspectives on reviewability also support the conclusion that the section 167 order in this case is non-final. Therefore, although I am unpersuaded by the cases upon which the majority relies[5] and believe the issue to be extremely close, I join in the judgment.
 
 
 61
 It is to be hoped, however, that future Supreme Court cases will clarify the import of cases such as PPG and Frozen Food Express upon the finality doctrine in terms of the need to show immediate operative effect to hold declaratory agency action final. Moreover, since section 167 has proven so problematic, perhaps the EPA and ultimately the Congress will reconsider its utility. That section seems to provide an anomalous and perhaps unnecessary remedy, neither fish nor fowl, which skews the administrative enforcement scheme and forces the courts to engage in lengthy exegeses such as this, adding to the pages of the federal reporter without noticeable benefit to our polity. At the very least, Congress could clarify its intent with respect to the finality of section 167 orders.
 
 
 
 *
 Hon. Maryanne Trump Barry, United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 Section 113(a), 42 U.S.C. Sec. 7413(a), has since 1977 provided that when "the [EPA] finds that any person is in violation of any requirement of an applicable implementation plan, the [EPA] shall notify the person in violation of the plan." If the violation by a major stationary source persists for longer than thirty days, the EPA is required to institute an enforcement action. 42 U.S.C. Sec. 7413(b)
 
 
 [2]
 At the time the West Penn and Lloyd A. Fry cases were decided, section 113 did not contain the provision mandating enforcement which was added in 1977. Thus, the statute construed in those cases was comparable to section 167, which does not contain any provision compelling further action
 
 
 [3]
 Our decision in No. 88-5623 (Solar Turbines' appeal) effectively disposes of the EPA's appeal in No. 88-5591. Therefore, we need not decide whether the EPA could appropriately appeal from an order which granted it the relief it sought but did so on the basis of a conclusion which it seeks to challenge. Cf. Watson v. City of Newark, 746 F.2d 1008, 1010 (3d Cir.1984) ("Generally, a party who receives all of the relief which he sought is not aggrieved by the judgment affording the relief and cannot appeal from it."); In re Arthur Treacher's Franchisee Litigation, 689 F.2d 1137, 1149 n. 16 (3d Cir.1982) (" '[a] party successful in the district court has no right of appeal from a judgment in its favor, for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree.' " (quoting Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 242, 59 S.Ct. 860, 860, 83 L.Ed. 1263 (1939)))
 
 
 [4]
 The pertinent portion of the statute reads, "[a] petition for review of ... any other final action of the [EPA] under this chapter ... which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit." 42 U.S.C. Sec. 7607(b)(1)
 
 
 [5]
 For example, the "finding" in p 3 states: "The Solar Turbines facility ... will have the potential to emit 1698 tons per year ... [of] nitrogen oxides." Petitioner's App. at 2
 
 
 [6]
 The "finding" in p 7 states: "[N]o information in support of [PADER's] cost determination [that the cost of controls for NOx emissions was 'economically infeasible'] was offered." Id. at 5
 
 
 [7]
 For example, the "conclusion" in p 7 states: "EPA finds that the PADER PSD permit issued to Solar Turbines does not conform to the requirements of Part C of the Act insofar as it fails to require installation of water or steam injection controls on the proposed gas turbines, in light of an absence of adequate justification as to why their installation is not required." Id. at 10
 
 
 [8]
 Since Solar Turbines has not shown that its placement on a "List of Violating Facilities" which recipients of federal contracts, grants and loans may not patronize, see 40 C.F.R. Sec. 15.31(a) (1988), is imminent, we do not decide whether noncompliance with a section 167 order alone is enough to place Solar Turbines on such a list or whether, if it were, that would render a section 167 order final agency action
 
 
 [1]
 Other cases have also held that agency action with no independent legal effect is reviewable. See Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) (reviewing declaratory ruling by the FCC); Modine Mfg. Corp. v. Kay, 791 F.2d 267 (3d Cir.1986) (holding ripe for review an EPA informal adjudication that regulations promulgated under the Federal Water Pollution Control Act applied to certain brass cleaning facilities); Better Gov't Ass'n v. Department of State, 780 F.2d 86 (D.C.Cir.1986) (holding ripe for review advisory guidelines for processing Freedom of Information Act requests); National Automatic Laundry & Cleaning Council v. Shultz, 443 F.2d 689 (D.C.Cir.1971) (holding ripe for review letter written by administrative agency construing legislative history of statute)
 The language of the APA also suggests that final declarations of an agency are reviewable. The APA states that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. Sec. 704. "Agency action" is defined as including an agency "order." 5 U.S.C. Secs. 701(b)(2), 551(13). And "order" is defined as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. Sec. 551(6) (emphasis added). Although review under the Clean Air Act is controlled by Sec. 307(b) rather than the APA, we have suggested that "[i]t makes sense to define 'finality' under the Clean Air Act in the same way that it is defined in administrative law generally." West Penn Power Co. v. EPA, 860 F.2d 581, 584 (3d Cir.1988).
 
 
 [2]
 Liveryman Thomas Hobson, who died in 1630 at the age of eighty-five or eighty-six, obliged customers "to take the horse which stood near the stable door" or none at all. Steele, The Spectator, no. 509 (Oct. 14, 1712)
 
 
 [3]
 On June 16, 1988, the EPA issued a notice of violation, pursuant to Sec. 113(a)(1) of the Clean Air Act, 42 U.S.C. Sec. 7413(a)(1), asserting that Solar was violating the Clean Air Act on the same grounds as that asserted in the prior section 167 order. The next day the EPA filed suit in the Middle District of Pennsylvania. Under Sec. 113(c)(1)(A)(ii), Solar is potentially liable for fines of $25,000 per day of violation if it is still in violation of the Act more than 30 days following notification of violation
 
 
 [4]
 Although West Penn was decided before the addition of the "final action" language to Sec. 307(b)(1), West Penn concluded that the notice of violation was not "final agency action" within the meaning of the Administrative Procedure Act. See 522 F.2d at 310-11. That we are now construing the finality language of Sec. 307(b)(1) rather than the APA, in my view, does not make a difference. See supra Typescript at 5 n. 1
 
 
 [5]
 FTC v. Standard Oil Co., 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), held that an FTC complaint was not final agency action subject to immediate judicial review, but the complaint in that case stated only that the Commission had " 'reason to believe' " that the companies were violating the Federal Trade Commission Act. 449 U.S. at 234, 101 S.Ct. at 490. The Court reasoned that "a reason to believe" averment was "not a definitive statement of position" and hence did not constitute final agency action. Id. at 240-41, 101 S.Ct. at 493-94. In addition, the oil company in that case did not contend that the issuance of the complaint had any practical effect on the conduct of its business, except to impose upon it the burden of responding to the charges made against it. In the instant case, however, the EPA's order forces Solar to change its way of doing business in order to avoid the risk of heavy penalties or the need to retrofit its facility
 Wearly v. FTC, 616 F.2d 662 (3d Cir.), cert. denied, 449 U.S. 822, 101 S.Ct. 81, 66 L.Ed.2d 25 (1980), is distinguishable first on the ground that the court there concluded that the FTC had not taken a final position on the type of confidential treatment to be accorded the documents and second that the plaintiff had not established that it was "on the horns of a dilemma." 616 F.2d at 667. The court concluded that there was no disadvantage to the plaintiff of ignoring the subpoena and waiting to enforcement proceedings. Id. at 667-68. In the instant case, by contrast, the EPA has made a final decision and Solar Turbines may be fined $25,000 per day of violation at the enforcement proceedings, making a delay in adjudication quite costly.
 Hooker Chemical Co. v. EPA, 642 F.2d 48 (3d Cir.1981), did state that "[t]he absence of a requirement to comply with the orders of the EPA at this time ... militates against a finding that the hardship factor has been met." 642 F.2d at 53. I agree that it does militate against finality, but as PPG, Frozen Food Express, and other cases indicate, an absence of a requirement to comply is not dispositive. In Hooker, we concluded that because "the EPA admitted that further investigation was necessary before it could properly act ... [, it] has yet to take a position with respect to an interpretation of the regulation that can be deemed as 'final' in the present posture of this case." 642 F.2d at 53. There is no lack of finality as to the EPA's position in the instant case.
 Wilmac Corp. v. Bowen, 811 F.2d 809 (3d Cir.1987), held that the plaintiff was not faced with the type of situation that has led courts to hold agency action final. The court reasoned that "[t]he threatened injury alleged is merely the risk that if [the plaintiff] decides to build [a nursing home addition], [it] will not be able to rely on Medicaid refunds to recoup its investment.... No sanctions whatever attend a decision not to build if the addition appears to be an unreasonable economic risk. Mere economic uncertainty affecting the plaintiff's planning is not sufficient to support premature review." 811 F.2d at 813. The Clean Air Act, unlike the statute involved in Wilmac, does provide for sanctions for noncompliance. There is also an intuitive difference between agency action which may potentially deny a corporation a state subsidy and agency action which may result in severe penalties against a corporation. Under the jurisprudence, the state retains greater discretion in distributing its largesse than in assessing penalties.